# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ST. LAWRENCE SEAWAY PILOTS ASSOCIATION, INC.<br>733 East Broadway Street<br>Cape Vincent, NY 13618<br><br>LAKES PILOTS ASSOCIATION, INC.<br>110 Water Street<br>Port Huron, MI 48060<br><br>and<br><br>WESTERN GREAT LAKES PILOTS ASSOCIATION, INC.<br>1111 Tower Avenue<br>Superior, WI 54880<br><br>　　　　　　　　　Plaintiffs,<br>　　　v.<br><br>UNITED STATES COAST GUARD<br>2100 Second Street, SW<br>Washington, DC 20593<br><br>　　　　　　　　　Defendant. | Civil Action No. _____ |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs St. Lawrence Seaway Pilots Association ("SLSPA"), Lakes Pilots Association, Inc. ("LPA"), and Western Great Lakes Pilots Association, Inc. "WGLPA"), collectively referred to as the "pilot associations," by their counsel, bring this complaint against the United States Coast Guard ("Coast Guard" or "Agency") and allege in support thereof the following:

1

## NATURE OF THE ACTION

1.   This action seeks judicial review under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551-59, 701-06, of the Coast Guard's final rule setting Great Lakes pilotage rates for 2014 (the "2014 Final Rate Rule").   *See* Great Lakes Pilotage Rates - 2014 Annual Review and Adjustment, issued February 28, 2014.   The rule is published at 79 Fed. Reg. 12084 (March 4, 2014).   The new rates take effect August 1, 2014.

2.   Although the Coast Guard has by legislative rule set out the methodology for adjusting pilotage rates on an annual basis, *see* 46 C.F.R. Part 404, Appendix A (the "Appendix A rate methodology"), the agency arbitrarily departed from that methodology in establishing the 2014 rates, and this departure will reduce each pilot's compensation under the 2014 rates by tens of thousands of dollars.

3.   In particular, although the Appendix A rate methodology requires that the pilots' "target compensation" be determined by reference to the compensation for first mates on U.S. Great Lakes vessels "based on the most current union contracts," *see* Appendix A, Step 2A, the 2014 Final Rate Rule, like the proposed rule, set out purported union contract rates that the Coast Guard was expressly advised in the rulemaking record were false, both by the pilots and by the union whose rates the rule was purporting to reflect.

4.   The agency nonetheless proceeded to use purported contract rates in the calculation that it knew to be wrong.   Use of these false union contract rates in the Appendix A calculation for the 2014 Final Rate Rule resulted in the pilots' target compensation being set far below the compensation that would have resulted from use of the proper union contract rates, and far below the compensation the Coast Guard itself had calculated in prior years when it used the proper union contract rates.

5. The chart below illustrates the dramatic reduction in target compensation for undesignated waters that occurred solely because the Coast Guard went from using the correct union contract rates to the incorrect rates starting with the 2013 final rate. A virtually identical decrease occurred in target compensation for designated waters. This result is particularly egregious because the union contract rates the Coast Guard purported to be referencing increased during this period.



| | 2010 Proposed | 2010 Final | 2011 Proposed | 2011 Final | 2012 Proposed | 2012 Final | 2013 Proposed | 2013 Final | 2014 Proposed | 2014 Final |
|---|---|---|---|---|---|---|---|---|---|---|
| Dollar Amount | $204,024 | $204,024 | $212,194 | $212,194 | $220,861 | $220,861 | $212,094 | $158,694 | $163,860 | $163,860 |

6. If the target compensation is set too low, the resulting pilotage rates will also be too low. The Coast Guard purported to fix the absurdly low pilotage rates that resulted from its use of the wrong union contract rates in the Appendix A methodology by making a "discretionary" determination that the pilotage rates should be increased. That "discretionary" increase in the

pilotage rates ameliorated some, but not all, of the impact of the Coast Guard's arbitrary and unlawful action, and left the rates set out in the rule about 8.5% lower on average than they should be.

7.   Because the Coast Guard's refusal to follow its own regulation and its arbitrary and capricious use of false data in its rate calculations violate the APA and cause substantial injury to the pilots represented by the plaintiff pilot associations, the 2014 Final Rate Rule should be remanded to the Coast Guard with instructions to apply the correct union contract rates, to promptly issue and make effective a revised final rule reflecting the correct union contract rates and to allow the pilots to recover the undercharges resulting from the improperly low rate.

## PARTIES

8.   The SLSPA represents 11 pilots and has jurisdiction over pilotage on Lake Ontario, the St. Lawrence Seaway, and connecting waterways, an area known as Pilotage District One. The SLSPA is organized under the laws of the State of New York and has its headquarters and principal place of business in Cape Vincent, New York.  SLSPA is a small business within the meaning of 5 U.S.C. § 605(b) and a small entity within the meaning of 28 U.S.C. § 2412(d)(2)(B).

9.   The LPA represents 10 pilots and has jurisdiction over pilotage on Lake Erie, the Detroit River, the St. Clair River, and connecting waterways, an area known as Pilotage District Two.  LPA is organized under the laws of the State of Michigan, and has its headquarters and principal place of business in Port Huron, Michigan.  LPA is a small business within the meaning of 5 U.S.C. § 605(b) and a small entity within the meaning of 28 U.S.C. § 2412(d)(2)(B).

10.   The WGLPA represents 14 pilots (13 active and one applicant) and has jurisdiction over pilotage on Lakes Huron, Michigan, and Superior, the St. Mary's River, and connecting

waterways, an area known as Pilotage District Three. WGLPA is organized under the laws of the State of Wisconsin and has its headquarters and principal place of business in Superior, Wisconsin. WGLPA is a small business within the meaning of 5 U.S.C. § 605(b) and a small entity within the meaning of 28 U.S.C. § 2412(d)(2)(B).

11. Defendant United States Coast Guard is a service in the Department of Homeland Security and has jurisdiction over many aspects of Great Lakes pilotage. The Coast Guard issued the final rule challenged in this action.

## JURISDICTION AND VENUE

12. This Court has jurisdiction under 5 U.S.C. § 702, and 28 U.S.C. §§1331, 1337, 1361, 1651, and 2201-02.

13. Venue is proper under 28 U.S.C. § 1391(e) as Defendant Coast Guard resides in this District and a substantial part of the events and omissions giving rise to the claim occurred in this District.

## ALLEGATIONS COMMON TO ALL CLAIMS

### A.   Statutory and Regulatory Background

14. The legal framework for Great Lakes pilotage is established by the Great Lakes Pilotage Act of 1960 (the "Act"), as amended, codified at 46 U.S.C. §§ 9301-08. The Act requires every foreign oceangoing vessel on the Great Lakes and the St. Lawrence Seaway to engage a registered U.S. or Canadian pilot, *id.*, § 9302, and provides for the establishment of regulations governing licensing and registration standards for Great Lakes pilots. *See id.* § 9303.

15. The Coast Guard has established regulations relating to, among other things, "the establishment of rates, charges, and other conditions or terms for services performed by registered pilots to meet the provisions of the Act." 46 C.F.R. § 401.100. The Coast Guard is

required by statute to review rates each year and to adjust them as necessary based on that review.  46 U.S.C. §9303(f) ("The Secretary shall establish new pilotage rates by March 1 of each year.")

16.  The methodology used by the Coast Guard to review and adjust rates is set out in Appendix A to 46 C.F.R., Part 404.  The Appendix A rate methodology is a legislative rule that the Coast Guard adopted after notice and comment rulemaking.  *See* 60 Fed. Reg. 18370 (Apr. 11, 1995), redesignated at 61 Fed. Reg. 32655 (June 25, 1996), further redesignated by USCG–1998–3976, 63 Fed. Reg. 35139 (June 29, 1998).

17.  In addition to allowing pilotage associations to recover their reasonable and necessary expenses and a return on their investment base, *see* 46 C.F.R. § 404.5(a)(1) and Appendix A, Steps 1, 4, 5, the pilotage rates are also designed to allow each pilot to earn "target compensation" at a level set with reference to the "average annual compensation for first mates on U.S. Great Lakes vessels."  Appendix A, Step 2A.  "The average annual compensation for first mates is determined based on the most current union contracts, and includes wages and benefits received by first mates." *Id.*

18.  Pilotage rates differ for pilotage services in undesignated waters and services in designated waters, but each is based on the compensation earned by first mates on U.S. Great Lakes vessels, determined based on the most current union contracts.  The main difference is that the rate in designated waters is based on 150% of that compensation while the rate in undesignated waters is 100% of that compensation.

19.  Appendix C to Part 404 provides a simplified methodology for annual review and update of pilotage rates, but the Coast Guard has chosen in recent years, as it did in the 2014

Final Rate Rule, to undertake the full Appendix A analysis to meet its statutory obligation to review and update pilotage rates each year.

**B.     The Coast Guard's Prior Implementation of the Appendix A Rate Methodology**

20.  To determine the pilots' target rate of compensation under Step 2A of Appendix A, the Coast Guard has for many years used the pay rates set out in the union contracts between the American Maritime Officers Union ("AMOU") and U.S. companies engaged in Great Lakes shipping.  *See, e.g.,* 2014 Final Rate Rule, at 28 ("The most current union contracts available to us are AMOU contracts with three U.S. companies engaged in Great Lakes shipping."); 78 Fed. Reg. 13521, 13529 (Feb. 28, 2013) (2013 final rule stating it was using most current AMOU contract rates); 77 Fed. Reg. 11752, 11760 (Feb. 28, 2012) (2012 final rule stating "The most current union contracts available to us are [AMOU] contracts with three U.S. companies engaged in Great Lakes shipping.").

21.  The compensation provided under the AMOU contracts includes not only a daily wage rate but also multipliers to that wage rate to take account of paid vacation days and additional days of holiday, weekends, and a seasonal bonus.  This information can be derived from the AMO contracts, and the Coast Guard has also had, since February 25, 2008, a letter from an AMO official that summarizes the data and sets out the correct multiplier (54.5/30). The 54.5 day multiplier represents 15.5 days added to the 30.5 days in an average month for vacation, plus 1.5 days for holidays, 4 days for weekends, and 3 days for a season bonus.  That letter was part of the rulemaking record for the 2014 rate.

22.  In addition, for medical and pension contributions, the AMOU contracts have provided at all relevant times for 15 additional days of benefits for each 30 days, resulting in a

multiplier for medical and pension contributions of 1.5 (45/30). That information was also available to the Coast Guard as part of the rulemaking record for the 2014 rate.

23. Up to and including in the 2013 proposed rate, the Coast Guard used the correct multipliers (54.5/30 for wages and 45/30 for benefits) to determine the level of AMOU compensation, and hence the pilots' "target compensation," for ratemaking purposes. Using those proper multipliers yielded target compensation for each pilot of $220,861 for undesignated waters and $301,005 for designated waters in the 2012 final rate, *see* 77 Fed. Reg. at 11762, and $212,094 and $293,302, respectively, for the proposed rate in 2013. *See* 77 Fed. Reg. 45539, 45547 (August 1, 2012).

24. The target compensation is an integral part of the calculation of the final pilotage rate and, if it is lower than it should be, than the rate will be lower than it should be and each pilot will suffer a loss in earnings. Pilots are not guaranteed the target compensation and earn it only if they work the targeted number of hours. If vessel traffic is less than the Coast Guard forecasts, as it has been for several years, pilots will earn, and have earned, less than the target compensation. If the pilotage rate is also lower than it should be, this shortfall is compounded.

C. **The Coast Guard's Erroneous Change in Position**

25. The proposed 2013 rate used the proper multipliers for the daily wage rate and benefits but included the wrong amounts for medical and pension contributions for certain contracts. The AMOU provided the Coast Guard the proper figures on November 2, 2012. All the Coast Guard had to do to correct its error in the 2013 proposed rate was to substitute these correct numbers into its proposed calculation.

26. Rather than undertaking this relatively straightforward task, the Coast Guard's Office of Great Lakes Pilotage requested that the AMOU provide it with an "aggregated rate." The

Pilotage Office's stated reason for this was that the AMOU was now treating the unaggregated information as proprietary. *See* 78 Fed. Reg. at 13,522, 13,529.

27. Since the AMOU had already provided the unaggregated information and the Coast Guard could readily aggregate it itself as it had done in prior years, the Coast Guard's stated reason for requesting aggregated information made no sense. Moreover, the Coast Guard had already made all of this information (save for the correct medical and pension information for certain contracts) publicly available in its *Notice* of the proposed 2013 rate. *See* 77 Fed. Reg. at 11761.

28. When the Coast Guard asked for the "aggregated rate" it did not allow the AMOU to calculate it based on its contracts. Instead, it arbitrarily directed the AMOU to calculate the rate in a manner different from the manner the Coast Guard had made the calculation in prior ratemakings, which had accurately reflected the contracts. The rate the AMOU provided at the Coast Guard's direction omitted significant components of the actual AMOU compensation for first mates and, thus, reflected a rate far lower than the actual contract rates.

29. The result of the Coast Guard's unexplained use of these new, and improper, "unaggregated" AMOU contract rates was that the pilots' target compensation in the 2013 Final Rate was dramatically reduced, from $212,094 to $158,694 (25.2 %) in undesignated waters and from $293,302 to $217,906 (25.7%) in designated waters. *Compare* 78 Fed. Reg. at 13530 (target compensation in 2013 final rule) *with* 77 Fed. Reg. at 45547 (target compensation in 2013 proposed rule). A reduction in target compensation directly reduces pilotage rates because under the rate methodology, a pilot who works the expected number of hours in a year at the established rate earns the target compensation. Therefore, the lower the target compensation the lower the rate.

30. It was, or should have been, patently obvious to the Coast Guard that this result was incorrect. The AMOU contract rates had not undergone the 25%+ decrease that the Coast Guard's new target compensation numbers reflected. To the contrary, the AMOU had, for example, publically announced in April 2012 a new contract providing for a 3% increase in compensation in 2013 and 2.5% increases in each of the years 2014 and 2015. See http://www.amo-union.org/Information~Page~201204-06.html.

31. The result of the Coast Guard's use of absurdly low figures for the AMOU contract rates was, predictably, absurdly low proposed pilotage rates for 2013.

32. The Coast Guard addressed the absurdity of the results obtained from its improper use of the AMOU data by making a so-called "discretionary" adjustment to the 2013 final rate so that the pilots would receive a pilotage rate increase similar to the one that Canadian Great Lakes pilots were to receive for 2013. This increase was 2.5% in each district; however, if the proper AMOU contract rates had been used, the increase, though varying somewhat between districts, would have averaged 11%. Only the rate of increase was similar to that of the Canadian pilots; the Coast Guard did not attempt to align the rates themselves or to make up significant disparities between the U.S. and Canadian rates.

**D.    The 2014 Ratemaking**

33. Although the pilots had advised the Coast Guard that the AMOU contract rates it had used in its 2013 final rule were wrong, and although that fact should have been immediately apparent to the Coast Guard in any event since it was obvious there had been no drastic decline in the AMOU contract rates as reflected in the 2013 final rule, in its *Notice* of the proposed 2014 rate, the Coast Guard continued to use incorrect AMOU data that drastically understated the actual AMOU contract rates. *See* 78 Fed. Reg. 48374, 48382 (Aug, 8, 2013).

34. The AMOU filed public comments on the proposed 2014 rate rule on October 4, 2013, stating expressly that the AMOU contract rates set out in the *Notice* of the proposed rule were wrong and providing the correct rates. The AMOU also pointed out that it should have been obvious to the Coast Guard that the contract rates used the proposed rule were wrong, since it had announced a significant *increase* in the AMOU contract rates for 2013, 2014, and 2015, but the Coast Guard was showing instead a drastic *decrease* in those rates from 2012 to 2013 and 2014.

35. The pilot associations commented on October 7, 2013, noting that the rates stated to be correct in the AMOU's October 4, 2013 comments were "well in excess of the figures used in the *Notice*," which were "consistently about 25% lower than they should be." The pilot associations noted that correcting the calculation of the pilotage rates by substituting the correct AMOU contract rates was an arithmetical exercise that involved no exercise of agency discretion or expertise and set out calculations based on the proper data which yielded target compensation based on this change alone of $218,136 for undesignated waters and $295,568 for designated waters. These compensation levels were in line with the target compensation in the 2012 final rate and 2013 proposed rate (within 3% in all cases), which were calculated before the Coast Guard began using the improper AMOU rates. *See* ¶ 5, *supra*.

36. The Coast Guard's 2014 Final Rate Rule nonetheless refused to use the correct AMOU data, offering reasons that were internally inconsistent, that failed to address the points raised by the AMOU and the pilots associations in any meaningful way, and that were so arbitrary and capricious as to be transparently pretextual.

37. The Coast Guard addressed the commenters' point that it was improperly using AMOU contract rates that showed "downward changes," when in fact the rates had increased, by

claiming that its "discussion is not a reflection on contract trends," but instead reflects that use of the data in "our Appendix A ratemaking methodology, could lead to a pilotage rate decrease." 79 Fed. Reg. at 12086. This statement is both false and nonsensical. The Coast Guard's *Notice* of the proposed rule expressly referred to supposed "downward changes in the AMOU contracts." 78 Fed. Reg. at 48376. Moreover, the *Notice* also expressly stated that the nearly 11% rate decrease that it calculated under the Appendix A rate methodology "was the result of [the] recent downward changes to the AMOU contracts." 79 Fed. Reg. at 12086. The Coast Guard's discussion thus expressly purported to be a "reflection on contract trends." The Coast Guard's claim that there was a "trend" that significantly decreased the AMOU contract rates is directly contrary to fact, as is its claim in the 2014 Final Rate Rule that it did not assert such a decrease.

38. The Coast Guard never addressed how it could be proper to use purported AMOU contract data that showed drastically decreasing union contract rates when those rates had in fact increased. Rather than provide such an explanation, the Coast Guard falsely stated that it had never asserted such a decrease. *See* ¶ 37, *supra*. The Coast Guard did, however, see fit to mention - twice - that the pilots' position on the matter had initially been presented by a "registered lobbyist," 79 Fed. Reg. at 12086, thus reflecting the Coast Guard's preference for pejorative rhetoric over reasoned decision-making.

39. The Coast Guard stated that it could not use the AMOU contract rates based on the AMOU's November 2, 2012 letter because the letter "was marked 'proprietary' and therefore has not been and cannot be shared by the coast Guard with the public." *Id.* However, the Coast Guard then used different aggregated contract rates even though the basis for the calculation of those rates had never been shared with the public. The Coast Guard's use of these incorrect

aggregated rates, rather than using the correct information it had been given, thus had nothing rationally to do with any issue of whether the data was proprietary or publicly available. Indeed, as noted above, almost all of the components set out in the AMOU's November 2, 2012 letter had already been disclosed by the Coast Guard itself in its notice of the 2013 proposed rate. *See* 77 Fed. Reg.at 11761. This data was thus far more readily available to the public than the data the Coast Guard ultimately used.

40. The Coast Guard also claimed that the AMOU had termed as "acceptable" a table of aggregate data contained in email correspondence between the AMOU and the Pilotage Director on December 17, 2012. 79 Fed. Reg. at 12086. This correspondence was never made available to the public or even referenced in the Coast Guard's Notice of Proposed Rule even though it was supposedly exchanged eight months before the *Notice* issued. Again, there is no rational basis for the Coast Guard's suggestion that its use of erroneous AMOU contract rates had anything to do with whether AMOU data was proprietary or public.

41. The Coast Guard acknowledged that on October 4, 2013 the AMOU had provided in the public rulemaking record aggregated union contract rates that "differ significantly" from the rates the Coast Guard had used in its proposed rule. *Id.* The Coast Guard did not explain the differences or set out why it was relying on aggregated contract rates supposedly offered in a private email exchange eight months previously, rather than on the aggregated contracts rates the AMOU had more recently provided in the public rulemaking proceeding and affirmed to be correct. Nor did the Coast Guard explain its basis for using data that that the AMOU had expressly advised the agency in the public rulemaking record was wrong.

42. The Coast Guard stated that the October 4, 2013 rate information provided by the AMOU "reflects a 'season bonus' that we do not recognize for purposes of Great Lakes pilotage

compensation. 46 C.F.R. 404.5(a)." The Coast Guard offered no explanation as to why it did not recognize the season bonus, did not state the amount of the bonus or how it related to the rate, and provided no basis for disregarding an element of compensation to which AMOU first mates are entitled. The regulation that the Coast Guard cited without explanation on the point, 46 C.F.R. § 404.5(a), deals with expenses, not compensation, and is entirely irrelevant to the issue. In prior rates, the Coast Guard had properly included the season bonus in the AMOU contract compensation, and the 2014 Final Rate Rule offered no explanation for the Coast Guard's change in position.

43. The Coast Guard stated that the "AMOU is under no obligation to share contract information with us," and has "not provided a copy of the contracts nor agreed to allow us to review them," which "compromises our ability to use that data in a transparent way and prohibits us from evaluating the individual components for compensation." 79 Fed. Reg. at 12086. The Coast Guard did not state that it had ever asked to review the underlying contracts, or that it had any basis to question the union contract rates provided in the October 4, 2013 AMOU letter, which, unlike the purported aggregated union contract rates the Coast Guard chose to use instead, were consistent with AMOU's public statements as to the result of its contract negotiations and were available in the public docket. The Coast Guard also did not state that it had ever made any effort to use any of the procedures routinely employed by agencies to allow the use of data claimed to be proprietary in agency proceedings while protecting its confidentiality. *See, e.g.* 14 C.F.R. §§ 302.11, 302.12 (setting out procedures used by the Department of Transportation to protect confidential information used in agency proceedings). In any event, the Coast Guard was equally unable to "evaluate the individual components for compensation" in the erroneous aggregated rates it used in both the proposed rule and the final

rule, which it continued to use even after the AMOU squarely advised in public rulemaking comments that the data was wrong.  The Coast Guard's use of AMOU data subject to exactly the same constraints as the data it refused to use cannot constitute rational decision-making, and the Coast Guard's proffered reasoning for refusing to use the correct information is arbitrary, capricious, and pretextual.

44.  The 2014 Final Rate Rule does not purport to override the results of the Appendix A methodology in order establish rates identical to the rates of Canadian pilots.  *See* 46 C.F.R. § 404.10(a).  To the contrary, the Final Rule expressly states that "it has not been possible to set identical rates since the early 1980s."  2014 Final Rate Rule at 13.

45.  The Coast Guard's misuse of the AMOU contract data in applying the Appendix A methodology resulted in proposed rates pursuant to that methodology that were on average, by the Coast Guard's own calculation, nearly 11% lower than the prior year's rates.  In order to ameliorate this absurd result, the Coast Guard stated it was exercising its discretion under 46 C.F.R. § 404.10(a) to increase rates over the prior's year's rate by 2.5%, the same increase Canadian pilots received.  This "discretionary" adjustment would not have been necessary had the Coast Guard properly applied the Appendix A rate methodology pursuant to its published regulations and using the correct AMOU contract rates.

E.      The Results of the Agency's Rulings

46.  Had the Coast Guard used the proper AMOU contract rates, the pilots would have received an average rate increase of approximately 11%.   Under the Coast Guard's "discretionary adjustment," the rate increase is only 2.5%.

47.  The Coast Guard's misuse of the AMOU contract data can thus be expected to cause each pilot to be undercompensated for his services by, on average, 8.5% under the 2014 rates.

48. The Coast Guard's misuse of the AMOU contract data, and the resulting failure of the Appendix A rate methodology to yield a plausible rate, also makes the pilots entirely dependent on the "discretion" of the agency as to their pilotage rates. This is an untenable position for any regulated entity and is expressly contrary to the Coast Guard's own regulations, which provide a rate methodology that cabins discretion and allows the pilots target compensation based on the compensation of first mates on Great Lakes vessels, plus reimbursement of reasonable and necessary expenses and a return on their investment base. This detailed ratemaking methodology is the antithesis of the purely discretionary regime under which the pilots will be forced to live absent relief in this action.

## CAUSE OF ACTION

## (VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT)

49. Plaintiff realleges and reincorporates paragraphs 1 through 48 as though fully set forth herein.

50. In promulgating the 2014 Final Rate Rule, the Coast Guard acted arbitrarily and capriciously, abused its discretion, acted contrary to law, and acted without observance of procedure required by law, within the meaning of 5 U.S.C. § 706(2)(A), in the following ways, among others, any one of which would be sufficient to invalidate its action:

(a)    failing to adhere to and apply properly its own regulations, including the Appendix A rate methodology;

(b)    departing from prior determinations without a reasoned explanation or justification;

(c)    using the wrong AMOU contract rates;

16

(d)     providing arbitrary, capricious and pretextual explanations for using the wrong AMOU contract rates;

(e)     failing to meaningfully address rulemaking comments, and

(f)     abusing its discretion by refusing to adopt the results of a properly applied Appendix A rate methodology and instead inventing pretextual reasons for departing from it.

WHEREFORE, Plaintiffs respectfully pray that this Court:

A.     Declare the 2014 Final Rate Rule to be arbitrary, capricious, and an abuse of discretion, contrary to law, and unsupported by substantial evidence;

B.     Remand the 2014 Final Rate Rule to the Coast Guard with instructions to apply the AMOU contract rates set forth in the AMOU's October 4, 2013 comments to the Appendix A rate methodology and to promptly issue a revised final rule with pilotage rates based on the correct AMOU contract rates;

C.     Direct the Coast Guard to allow the plaintiffs to collect from customers the amount of the undercharges between the rates that would have been in effect had the Coast Guard properly applied the Appendix A Rate methodology to begin with and any unlawful rates charged as calculated in the 2014 Final Rate Rule;

D.     Award Plaintiff its reasonable attorneys' fees and costs incurred herein under the Equal Access to Justice Act and other applicable provisions of law; and

E.     Grant such other and further relief as the Court may deem appropriate.

Respectfully submitted,

John Longstreth (# 367047)
Mark Ruge (#461738)
K&L GATES LLP
1601 K Street, N.W.
Washington, D.C. 20006
(202) 778-9000
(202) 778-9100 (fax)
john.longstreth@klgates.com
mark.ruge@klgates.com

*Counsel for Plaintiffs St. Lawrence Seaway Pilots*
*Association, Inc. Lakes Pilots Association, Inc., and*
*Western Great Lakes Pilots Association, Inc.*

Date:  March 11, 2014