**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| ST. LAWRENCE SEAWAY PILOTS ASSOCIATION, INC., *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Civil Action No. 14-cv-392 (TSC) |
| UNITED STATES COAST GUARD, | ) ) | |
| Defendant. | ) ) ) | |

## MEMORANDUM OPINION

Plaintiffs St. Lawrence Seaway Pilots Associations, Inc., Lakes Pilots Association, Inc., and Western Great Lakes Pilots Association, Inc. challenge the Coast Guard's final rule setting pilotage rates on the Great Lakes for 2014 (the "2014 Final Rate"). Great Lakes Pilotage Rates – 2014 Annual Review and Adjustment, 79 Fed. Reg. 12084 (March 4, 2014). Plaintiffs allege the Coast Guard misapplied the regulatory formula by using incorrect inputs, resulting in unreasonably low rates, and seek review of the 2014 Final Rate under the Administrative Procedure Act ("APA"). The parties have each moved for summary judgment. For the reasons set forth below, the Court GRANTS Plaintiffs' motion for summary judgment, DENIES Defendant's motion for summary judgment, and orders supplemental briefing on the question of a proper remedy.

1

## I.      BACKGROUND

The Great Lakes Pilotage Act of 1960 requires foreign and American ships engaged in

foreign trade traveling on the Great Lakes[1] to hire an American or Canadian pilot to provide

navigational services.  46 U.S.C. §§ 9301 *et seq*.; *see also Lake Pilots Ass'n, Inc. v. U.S. Coast

Guard*, 257 F. Supp. 2d 148, 151-52 (D.D.C. 2003).  The Secretary of Transportation has

delegated to the Coast Guard's Director of the Great Lakes Pilotage Office the authority to set

rates the pilots may charge for their services, 46 U.S.C. § 9303(f).  The statute does not provide a

formula or method for setting these rates.  Instead the Coast Guard adopted, through notice and

comment rulemaking, a methodology for calculating the rate which is now codified at 46 C.F.R.

§ 404 and the appendices to that section.

Plaintiffs challenge the Coast Guard's application of that methodology in the 2014 Final

Rate.  This dispute centers specifically on step 2.A of the 7-step rulemaking methodology,

"Determination of Target Rate of Compensation."  To understand Plaintiffs' challenge to the

Step 2.A calculation for the 2014 Final Rate, one must first understand how the Coast Guard set

the rates in 2012 and 2013.  Below are timelines for the establishment of the 2012, 2013, and

2014 rates.

### i.  The 2012 Rate

**February 28, 2012**: Coast Guard announced the rate for 2012.  2012 Rates for Pilotage

on the Great Lakes, 77 Fed. Reg. 11752 (Feb. 28, 2012).  In computing the 2012 rate the Coast

Guard used the pay rates contained in the union contracts between the American Maritime

Officers Union ("AMOU") and companies engaged in shipping on the Great Lakes.  *See, e.g.*, *id.*

---

[1] There are two types of waters in the Great Lakes on which pilot services are required.  In designated waters the
pilot must direct the vessel, while in undesignated waters the pilot must be on board and available to direct the
vessel at the master's discretion.  *Lake Pilots Ass'n*, 257 F. Supp. 2d at 151-52.  The rates for each category are
different, but for relevant purposes are determined using the same methodology.

at 11760.  The contracts provided for payment of a daily wage.  The Coast Guard then multiplied

the daily wage by either 54.5 days or 49.5 days[2] in order to generate "monthly figures that

represent actual working days and vacation, holiday, weekend, or bonus days."  *Id.*  By creating

a monthly figure representing approximately 50 days of wages, the formula accounted for

payment of vacations, holidays, weekends, and bonus days.  A similar calculation was performed

on other components of compensation – e.g., employer contributions to 401K plans, pensions,

and insurance.  *Id.*  These wage and benefits components were aggregated into one annual target

compensation rate for a nine-month shipping season: $220,861 in undesignated waters and

$301,005 in designated waters.  *Id.* at 11761-62.

### ii.  The 2013 Proposed Rate

**August 1, 2012:** Coast Guard published notice of proposed rulemaking to set the 2013

rate.  Great Lakes Pilotage Rates – 2013 Annual Review and Adjustment, 77 Fed. Reg. 45549

(Aug. 1, 2012) (the 2013 Proposed Rate).  To calculate the 2013 Proposed Rate, the Coast Guard

used a daily rate (applicable to Agreement A only) which was lower than the daily rate used in

2012.  *Compare* 77 Fed. Reg. at 11761 (2012 daily rate of $287.09) *with* 77 Fed. Reg. at 45545

(2013 proposed daily rate of $270.61).  The Coast Guard also accounted for a pension plan

contribution of $0.00, and halved the amount of the medical insurance contribution.  77 Fed.

Reg. at 45546.  These changes resulted in proposed target compensation rates lower than the

2012 rate: $212,094 in undesignated waters and $293,302 in designated waters.  77 Fed. Reg. at

45545-46.

### 1.  The Coast Guard Received Comments Criticizing its Proposed 2013 Rate

---

[2] The AMOU has contracts with three companies engaged in Great Lakes Shipping represented by two agreements: Agreement A and Agreement B.  79 Fed. Reg. at 12093.

**August 14, 2012**: Coast Guard received email from AMOU with a chart of the "pension plan and medical plan contributions" for 2012, 2013, 2014, and 2015.  (A.R. 103).

**September 24, 2012:** Coast Guard received letter from the Lake Pilots Association, Inc. stating that the "daily rate" for Agreement A effective August 1, 2013 was $295.94 and set forth the planned increases for 2014 and 2015.  (A.R. 107).

**September 25, 2012**:  AMOU sent letter to Coast Guard with Agreement A daily rates in 2013, 2014 and 2015. (A.R. 108).[3]  *See also* Great Lakes Pilotage Rates – 2013 Annual Review and Adjustment, 78 Fed. Reg. 13521, 13522 (Feb. 28, 2013) (summarizing comments).

## 2.  The Coast Guard Received Aggregated Data which did not Include Season Bonuses

**Exact date unknown, after September 25, 2012:** Coast Guard "reached out to AMOU to inquire if the contract that [the Coast Guard] had used was superseded."  78 Fed. Reg. at 13522.

**November 2, 2012:** AMOU provided the correct daily wage rates as well as the correct medical and pension plan contributions.  (A.R. 131) (filed under seal) (the "Nov. 2 Letter").  The letter included an annotation that the information was "strictly confidential" and could not be made public without AMOU's consent.  *Id.*

**November 15, 2012:** AMOU submitted two letters to the Coast Guard providing "the correct daily aggregate rates" for Agreement A effective as of August 1, 2013, August 1, 2014, and August 1, 2015.  (A.R. 132-33).  One letter included "the daily wage rate, vacation pay,

---

[3] The Court will refer to the corrected data received in these August and September 2012 comments as the Corrected, Disaggregated Data or CDD.

pension plan contributions and medical plan contributions" and the other excluded vacation pay (*Id.*).

**December 5, 2012**: AMOU provided the aggregate rates for Agreement B.  (A.R. 134-134'[4]).[5]  Again, one of the Dec. 5 Letters included vacation pay and one did not.  (*Id.*).[6]  None of the Aggregated Data ("AD") includes a season bonus, holiday or weekend pay.

**December 17, 2012**: AMOU confirmed that a table containing the AD is "acceptable" for publication.  (A.R. 135 (filed under seal); 137-141).

As of December 2012, the Coast Guard had one daily aggregated rate which purportedly accounted for all of the benefits provided for in the AMOU contracts.  Thus, it could slightly alter the way it calculated the target rate.  Instead of multiplying the wage and benefit components into monthly figures, the Coast Guard simply took the daily rate and multiplied it by 270 – representing the days in a nine-month shipping season.  78 Fed. Reg. at 13529.  A consequence of this change was that holidays, weekends and bonus days were no longer accounted for in the formula.  *Compare* 77 Fed. Reg. at 11761 (computing "monthly figures that represent actual working days and vacation, holiday, weekend, or bonus days" in 2012) *with* 78 Fed. Reg. at 13522 ("These aggregate rates combine, without separately identifying, the following inputs: Daily wage rate, vacation pay, pension plan contributions, and medical plan

---

[4] The Administrative Record filed with the court erroneously assigned page number 134 to both December 5, 2012 letters.  The second letter is identified by the Court as A.R. 134'.

[5] The Court will refer to the November 15 and December 5 Letters collectively as the Aggregated Data, or AD.

[6] Plaintiffs argue that the Coast Guard attempted to "manage the result to a predetermined conclusion (Pl. Mem. 27) by deliberately manipulating the data upon which it relied and allege that the Coast Guard requested that the AMOU provide the AD in duplicate and exclude vacation pay in one of the two submissions.  (*See, e.g.*, Compl. ¶¶ 26-28; Pl. Mem. 7-8, 27).  However, the Administrative Record contains only two oblique references to a Coast Guard "request" and contains no evidence of any direction as to the contents of any AMOU submission.  (*See* A.R. 230 (October 7, 2013 comment from Plaintiffs' counsel on proposed 2014 rate noting that "the Pilotage Office requested that AMO provide it with an 'aggregated rate'" in 2012); A.R. 137-38 (December 5, 2012 email from AMOU to Coast Guard attaching "the letters you requested")).

contributions" in 2013).  The new methodology also changed the way the Coast Guard visually presented some of the steps of its calculation.  78 Fed. Reg. at 13522.

### 3.   The Coast Guard Finalized the 2013 Rate Using Aggregated Data Exclusive of Season Bonuses

**February 28, 2013**: Coast Guard announced the final rate for 2013.  The final rate would have been, on average, 16% lower than the 2012 rates.  *Id.* at 13537.  Concluding in its discretion[7] that a 16% rate decrease could "jeopardize the ability of the three pilotage associations to provide safe, dependable service," the Coast Guard exercised its discretion to adjust the rates for an average 1.87% increase over the 2012 Rate.  *Id.* at 13524, 13536.  In the announcement of the final 2013 rate the Coast Guard also responded to the comments it received that its proposed rate was wrong, and explained the changes to the data it was using.  *See supra* Section I.ii.2.

### iii.   The 2014 Proposed Rate

**August 8, 2013**: The Coast Guard announced a notice of proposed rulemaking for the 2014 rate.  Great Lakes Pilotage Rates – 2014 Annual Review and Adjustment, 78 Fed. Reg. 48374 (Aug. 8, 2013).  The 2014 Proposed Rate again relied on the AD (which stated there would be a 3% increase in the daily wage over the 2013 wage).  (A.R. 132-134').  The 2014 proposed target compensation rate was $163,860 for undesignated waters and $225,000 for designated waters and, taken through the full calculation, would have resulted "in an average 10.74 percent rate decrease" from the 2013 Final Rate.  78 Fed. Reg. at 48376, 48382.  The Coast Guard stated that the rate decrease was a "result of recent downward changes to [AMOU]

---

[7] The Coast Guard has discretionary authority in the last step of the process to adjust the rates "based on requirements of the Memorandum of Arrangements between the United States and Canada, and other supportable circumstances that may be appropriate."  46 C.F.R. § 404, Appx A.  In the 2014 Final Rate and the 2013 Final Rate the Coast Guard implemented an increase in rates that matched the percent increase in Canadian rates.  78 Fed. Reg. at 13537 (2013); 79 Fed. Reg. at 12100 (2014).

contracts." *Id.* at 48376; *see also id.* at 48389 ("This decrease is not due to increased efficiencies in pilotage services but rather a result of recent significant downward adjustments to AMOU contracts"). The Coast Guard again proposed exercising its discretion to adjust the proposed 2014 rates for a 2.5% increase from the 2013 Final Rate. *Id.* at 48376.

### iv.   Comments to the 2014 Proposed Rate

**October 4, 2013**: a comment from the AMOU provided revised AD, which included holidays, weekends, and a season bonus in the aggregated daily rate. (A.R. 217-18). The Coast Guard received comments asserting that the Coast Guard "incorrectly interpreted or misapplied AMOU contract data" and disputing the Coast Guard's statement that "recent AMOU contracts are marked by 'downward changes,'" and pointed out that AMOU contracts actually increase wages over a 5-year period." 79 Fed. Reg. at 12086.

### v.   The 2014 Final Rate

**March 4, 2014**: Coast Guard announced the 2014 Final Rate and responded to the comments it received on the proposed 2014 rate. *See supra* Section I.iv.

The Coast Guard disavowed the statement it had made on AMOU contract trends. It stated: "Our discussion is not a reflection on AMOU contract trends, but rather emphasizes that AMOU contract information, when factored into our Appendix A ratemaking methodology, could lead to a pilotage rate decrease, if not offset by the application of discretion under Step 7." 79 Fed. Reg. at 12086.

The Coast Guard also disputed the comments' assertions that it had misapplied the AMOU data. The Coast reiterated the accuracy of the data used to compute the 2014 proposed rule. *Id.* It explained that it declined to use the data from the November 2, 2012 Letter because the information "was marked 'proprietary,' and therefore has not been and cannot be shared by the Coast Guard with the public." *Id.* Further, the Coast Guard cited the fact that the AMOU

had apparently confirmed the accuracy of the AD in connection with the 2013 rate as justification for continuing to rely on that data. *Id.* (referencing the AMOU email at A.R. 139).

Finally, the Coast Guard rejected the updated AD because it included a "'season bonus' that the AMOU has not previously cited as part of its contracts, and that we do not recognize for purposes of Great Lakes pilotage compensation. 46 CFR 404.5(a)." 79 Fed. Reg. at 12086.[8] The provision of the C.F.R. cited by the Coast Guard provides guidelines to determine whether certain expenses will be recognized as part of the ratemaking process, and includes "medical, pension, and other benefits paid to pilots." 46 C.F.R. § 404.5(a)(6).

The final 2014 rate adopted the rate as it was proposed in August 2013, including the proposed discretionary increase.

## II. LEGAL STANDARD

On a motion for summary judgment in a suit seeking APA review, the standard under Fed. R. Civ. P. 56(a) does not apply. *Coe v. McHugh*, 968 F. Supp. 2d 237, 239 (D.D.C. 2013). Instead the court must decide as a matter of law "whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Id.* at 240 (citing *Richards v. INS*, 554 F.2d 1173, 1177 & n. 28 (D.C. Cir. 1977)).

Pursuant to the APA, the Court must set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5. U.S.C. § 706(2). The Court's review is "highly deferential" and begins with a presumption that the agency's

---

[8] 46 C.F.R. § 404.5(a)(6), "Guidelines for recognition of expenses," provides in full:

> The following is a listing of the principal guidelines followed by the Director when determining whether expenses will be recognized in the ratemaking process... Medical, pension, and other benefits paid to pilots, or for the benefit of pilots, by the Association are treated as pilot compensation. The amount recognized for each of these benefits is the cost of these benefits in the most recent union contract for first mates on Great Lakes vessels. Any expenses in excess of this amount are not recognized for ratemaking purposes.

actions are valid. *Envtl. Def. Fund, Inc. v. Costle*, 657 F.2d 275, 283 (D.C. Cir. 1981). The Court is "not empowered to substitute its judgment for that of the agency," *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), but instead must consider only "whether the agency acted within the scope of its legal authority, whether the agency has explained its decision, whether the facts on which the agency purports to have relied have some basis in the record, and whether the agency considered the relevant factors." *Fulbright v. McHugh*, No. 12-cv-01506, 2014 WL 4424750, at *4 (D.D.C. Sept. 9, 2014) (citing *Fund for Animals v. Babbitt*, 903 F. Supp. 96, 105 (D.D.C. 1995)).[9] The plaintiff bears the burden of establishing the invalidity of the agency's action. *Id.*

## III.    ANALYSIS

### A.  Target Compensation Rates Must Approximate AMOU Contract Rates

By the plain terms of the Coast Guard's own regulations, target pilot compensation is intended to "approximate[] the average annual compensation for first mates on U.S. Great Lakes vessels."[10] 46 C.F.R. § 404 Appx. A. When the Coast Guard adopted the methodology in 1996 it stated that this section "continues the Department policy of maintaining income comparability between Great Lakes Registered Pilots, and masters/chief mates on Great Lakes vessels . . . . The use of local masters and mates pay scales has the important impact of tying pilot compensation to the regional industry pay levels." Great Lake Pilotage Rate Methodology, 61 Fed. Reg. 21081,

---

[9] Defendant argues that the Court should give the Coast Guard its "greatest deference" because it exercises "special competence" in the subject matter. (Def. Mem. at 9-10). The case upon which the Coast Guard relies, *Pub. Emp. for Envtl. Resp. v. Beaudreu*, 25 F. Supp. 3d 67, 100 (D.D.C. 2014) extended this extreme deference to the Coast Guard in a matter regarding maritime safety, which is not at issue here. The record does not suggest that similarly specialized expertise is involved in this case. *See Fund for Animals*, 903 F. Supp. at 105 ("The Court is expected to recognize the agency's expertise and experience with respect to questions involving scientific or technical matters or policy decisions based on uncertain technical information.").

[10] In undesignated waters. The target compensation rate in designated waters approximates the wages of masters, not first mates. 46 C.F.R. § 404 Appx. A.

21083 (May 9, 1996); *see also Lake Pilots Ass'n, Inc.*, 257 F. Supp. 2d at 169 ("the purpose of

the regulation pertaining to target pilot compensation is to keep the pilots' income comparable to

private masters and first mates operating domestic vessels on the Great Lakes with similar

responsibilities.") (internal quotation omitted).  In *Lake Pilots Ass'n,* plaintiffs challenged the

Coast Guard's reliance on a ship operating company's expenses in paying for certain pilot

benefits instead of the most recent union contracts.  257 F. Supp. 2d at 167.  In determining that

the agency's action was improper, the court emphasized that when the Coast Guard departed

from the language of its regulations *and* failed to "provide notice to interested parties regarding

the alternative source of the data it would use, or to provide in the administrative record any

justification for its reliance on the figures it used to make its calculations," the rate was arbitrary

and capricious.  *Id.* at 168.

Plaintiffs here challenge as nefarious and conspiratorial most of the Coast Guard's

decisions concerning pilotage rates in the last three years, but they focus primarily on two of the

Coast Guard's decisions: use of the AD, and rejection of the Updated AD.  The Court assesses

whether these choices were reasonably made in furtherance of Step 2.A's goal: approximation of

AMOU contract wages.

### B.  The Rejection of the CDD and Use of the AD

Plaintiffs challenge the Coast Guard's use of the AD instead of the CDD in 2014.  The

choice to use the AD instead of the CDD was first made in connection with the 2013 rate, but

because the 2013 rate was not and is not challenged here, the Court need not engage in an

analysis of whether that decision was reasonable and adequately supported.

In 2014, the Coast Guard could have utilized the CDD, or the Updated AD, or sought an

entirely new source for the data, but instead adhered to its decision to use the AD because it was

"provided and confirmed" by the AMOU.   79 Fed. Reg. at 12086.  It made this decision despite

comments from the AMOU and Plaintiffs claiming that the AD was not accurate.  *See supra* Section I.iv.

When an agency's information is challenged, the agency is not always required to use new data, but must "provide a full analytical defense" and show that it is "conscious of the limits of" the data.  *Eagle-Picher Indus., Inc. v. E.P.A.*, 759 F.2d 905, 922 (D.C. Cir. 1985); *Ass'n of Oil Pipe Lines v. F.E.R.C.*, 83 F.3d 1424, 1433-35 (D.C. Cir. 1996) (FERC's choice of index in setting pipeline rates was not arbitrary and capricious where record demonstrated "reasoned judgment in selecting" the "most suitable" index).  Although courts will defer to the agency's choice of data when the agency was faced with competing data or models, *Pub. Emps. for Envtl. Resp. v. U.S. Dep't of the Interior*, 832 F. Supp. 2d 5, 26 (D.D.C. 2011), the agency's choice is arbitrary and capricious when "there is simply no rational relationship between the model and the known behavior of the items to which it is applied."  *Greater Yellowstone Coal. v. Kempthorne*, 577 F. Supp. 2d 183, 198 (D.D.C. 2008) (National Park Service's Final Environmental Impact Statement, relating to snowmobiles in Yellowstone, was vacated as arbitrary because it relied on sound level analysis with significant discrepancies).

The "analytical defense" the Coast Guard provided for its continued use of the AD was, effectively, that the AMOU had previously approved of that data.  79 Fed. Reg. at 12086.  This justification might have been valid in 2013, when the Coast Guard received an email from the AMOU confirming that a table reflecting the AD was "acceptable" to the AMOU.[11]  (A.R. 139-141).  However the AMOU's comment for the 2014 rate made clear the AMOU did not endorse

---

[11] Plaintiffs assert that the AMOU approved of only the format of the table, not the data itself.  (Pls. Mem. 28).  That question, which is nearly impossible to resolve based on the Administrative Record, impacts the reasonableness of the 2013 decision (not at issue here) far more than the 2014 decision.  The 2014 decision to continue using the AD followed the AMOU's disavowal of any approval it had provided in the previous year.

the numbers in the AD.  (A.R. 217).  The Coast Guard did not address this comment except to

note that it would not use what AMOU provided as the correct figure because it included a

season bonus.  *See infra* Section III.C.  Because the Coast Guard provided no rational

justification for its decision to continue using data *the source of which* affirmatively stated was

inaccurate, the Court must find that its actions were arbitrary and capricious.[12]  *See, e.g., Chem.

Mfrs. Ass'n v. E.P.A.*, 28 F.3d 1259, 1266 (D.C. Cir. 1994) (EPA was arbitrary and capricious in

responding to a comment about an emissions standard "in an unsupported and conclusory

fashion" which "added nothing to the agency's defense of its thesis except perhaps the

implication that it was committed to its position regardless of any facts to the contrary").

## C.  The Decision to Reject the Updated AD Because it Included a Season Bonus was Arbitrary and Capricious

As a general matter, "an agency's interpretation of its own regulation is entitled to

deference."  *Auer v. Robbins*, 519 U.S. 452, 461 (1997).  *Auer* deference is due when the

agency's interpretation is not "plainly erroneous or inconsistent with the regulation."  *Id.*  The

Court must ordinarily afford the Coast Guard's interpretation of its regulation "controlling

weight" unless "an alternative reading is compelled by the regulation's plain language."

*Akiachak Native Cmty. v. Salazar*, 935 F. Supp. 2d 195, 208-09 (D.D.C. 2013).  However, this

deference is due only when the regulation is ambiguous, there is no reason to suspect the

---

[12] The Court is further persuaded that the decision to continue using the AD in 2014 was arbitrary and capricious because the justifications for that decision in 2013 were flimsy at best.  First, the Coast Guard affirmatively reached out to the AMOU for the AD, even though the AMOU had already provided the necessary CDD in its August 14 and September 25 comments.  78 Fed. Reg. at 13522.  Second, the Coast Guard stated that it used the AD and not the November 2, 2012 letter (which was essentially a duplicate of the CDD) because the AMOU treated "each individual component of wage, health, and pension benefits as proprietary information and did not consent to our request to disclose this information."  78 Fed. Reg. at 13522.  However, in the same explanation, it also stated: "The associations claimed the Agreement A health benefit should be $105.61 per day, not $52.96.  Second, the associations claimed the Agreement A pension benefit should be $44.61 per day, not zero.  Third, the associations claimed the Agreement A daily wage rate should be $295.94, not $270.61."  *Id.*  Thus, by virtue of this statement, and the publication of the various wage components in the proposed 2013 rate, 77 Fed. Reg. at 11761-62, the Coast Guard had in fact published all of the components.

interpretation does not reflect the agency's "fair and considered judgment," and the interpretation is "fairly supported" by the regulation.  *Drake v. F.A.A.*, 291 F.3d 59, 68 (D.C. Cir. 2002); *Christensen v. Harris Cnty.*, 529 U.S. 576, 588 (2000) (*Auer* deference is required "only when the language of the regulation is ambiguous").

These conditions are not met here.  The regulation cited by the Coast Guard to exclude the season bonus from target compensation applies to the "recognition of expenses," which is an accounting of Plaintiffs' expenses for Step 1 of the process – not the disputed Step 2.A.  46 C.F.R. § 404.5; *see also* Def. Mem. at 2-3 ("Step 1 involves gathering financial information from the three voluntary pilot associations.  This data includes recognizable expenses for each pilotage association").  The Coast Guard has summarily asserted that this section resolves the question of including season bonuses as part of pilot compensation, though that is not at all clear from the regulation.  Even if the Court defers to the Coast Guard's argument that this regulation is applicable to calculation of compensation, not expenses, it cannot agree that excluding season bonuses is "fairly supported" by the regulation, *Drake*, 291 F.3d at 68, which provides for the inclusion of "medical, pension, and other benefits paid to pilots, or for the benefit of pilots."  46 C.F.R. § 404.5(a)(6).  The Coast Guard has offered no explanation supporting its interpretation of "other benefits paid to pilots" to exclude holidays, weekends, and a season bonus.

The Coast Guard's interpretation of § 404.5(6) to exclude holidays, weekends, and the season bonus is particularly unconvincing because until publication of the 2013 rate, the Coast Guard had consistently included those elements of pay in calculating target compensation.  As described above, one step in calculating the rate in 2012 was the multiplication of the daily wage rate into "monthly figures that represent actual working days and vacation, *holiday, weekend, or bonus days*."  77 Fed. Reg. at 11761 (emphasis added); *see also* A.R. 234 (Feb. 25, 2008 letter

from AMOU to Lake Pilots Association Inc. indicating that part of the monthly multiplier of 54.5 includes 3 days for "additional days of pay for season bonus per month").  When an agency departs from its prior policies or practices, it must acknowledge and explain the departure. *Columbia Broad. Sys., Inc. v. F.C.C.*, 454 F.2d 1018, 1027 (D.C. Cir. 1971) ("the Commission's utter failure to come to grips with this problem constitutes an inexcusable departure from the essential requirement of reasoned decision making"); *Ramaprakash v. F.A.A.*, 346 F.3d 1121, 1125 (D.C. Cir. 2003).  The Coast Guard gave no explanation for departing from its position of recognizing these extra days to not recognizing them.  There is instead an assertion that no departure occurred.  79 Fed. Reg. at 12086.  The Coast Guard's explanation for why it departed from its prior practice is inadequate, because it is supported by a single statement which "runs counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Farmers Union Cent. Exch., Inc. v. F.E.R.C.*, 734 F.2d 1486, 1517 (D.C. Cir. 1984). As such the Court concludes that the 2014 Final Rate is arbitrary and capricious and must be set aside.[13]

### D.  Remedy

The typical remedy for an arbitrary and capricious agency action is to vacate the rule. *Humane Socy' of the United States v. Jewell*, --- F. Supp. 3d ---, No. 13-186, 2014 WL 7237702 (D.D.C. Dec. 19, 2014).  In deciding whether to provide the typical remedy, the Court is guided by two factors: "the seriousness of the…deficiencies of the action" and "the disruptive consequences of vacatur." *Heartland Reg'l Med. Ctr.. v. Sebelius*, 566 F.3d 193, 197 (D.C. Cir.

---

[13] That the rate was then adjusted upward at Step 7 of the process does not negate these fatal flaws to the methodology.  Had data which more accurately reflected the AMOU contracts been used at Step 2.A, the resulting rate might have been even higher than the final, adjusted rate, or might have been adjusted to a different degree. Moreover, the adjustments were not made to correct for misused data, but to align with the increase in Canadian rate increases.  78 Fed. Reg. at 13537 (2013); 79 Fed. Reg. at 12100 (2014).  The Coast Guard did note that without the adjustment, one pilots association might be forced into bankruptcy, a factor which only further demonstrates that something was amiss with the data on which the Coast Guard relied. *Id.*

2009) (alteration in original).  Plaintiffs argue that the disruptive consequences here – reversion to the 2013 Rate, which is lower than the 2014 Rate – would be more prejudicial than leaving the too-low 2014 Rate in place.  (Pl. Mem. 30).  Plaintiffs also ask the Court to "make clear" that "pilots will be entitled to recover from shippers the difference between that new rate and the improper rate as of August 1, 2014."  (Pl. Mem. 31).  The only case on which Plaintiffs rely in support of the notion that the Court may preemptively adjudicate their right to seek refunds from a third party is not entirely on point, as it provided for a refund *by the agency* of improperly assessed fees.  *See Allied-Signal, Inc. v. N.R.C.*, 988 F.2d 146, 153 (D.C. Cir. 1993).  The Court is also mindful that its decision likely impacts the propriety and validity of the 2015 rate. Defendant does not address Plaintiffs' arguments concerning the proper remedy.

Although the Court could deem the Coast Guard's silence to be a concession that the requested relief is proper, *Phrasavang v. Deutsche Bank*, 656 F. Supp. 2d 196, 201 (D.D.C. 2009), the Court is not inclined to deviate from the typical remedy without the benefit of argument from all parties.  The parties shall therefore file supplemental briefs addressing the issue of a proper remedy.

## IV.   CONCLUSION

For the reasons set forth above, the Court concludes the 2014 Final Rate was arbitrary and capricious.  Accordingly, Plaintiffs' motion for summary judgment is GRANTED and Defendant's cross-motion for summary judgment is DENIED.  Plaintiffs shall file a brief addressing a proper remedy on April 17, 2015.  Defendant shall file a response no later than May 8, 2015.  Plaintiffs may reply by May 18, 2015.  Plaintiffs' opening brief and Defendant's response shall each be limited to 15 pages.  Plaintiffs' reply shall be no more than 8 pages.

A corresponding order will issue separately.

Dated: March 27, 2015